Good morning, Your Honors. Yan Zhao on behalf of the Petitioner. May it please the Court, we received this Court's focus order and we really appreciate it. As the Honors know, this case involves a variety of issues. We stand on our position on all those issues as stated in our briefs. But for today's hearing, I'd like to focus my time on the questions posed in the focus order, which concerns the country conditions evidence. The country conditions evidence alone, independent of the Petitioner's testimony, could justify cat relief and must be given recent consideration. The BIA has not done so, and the government has waived any argument to the contrary. Therefore, we ask that this case be remanded so that the BIA could properly consider the evidence in the first instance. I'd like to go into detail as to each question in the focus order. First, the expert testimony as the documentary evidence compels the finding that the Petitioner will likely be tortured, either by or with the acquiescence of the government, if he returns to Mexico. And the evidence also compels the finding that there is no safe place in Mexico for the Petitioner to relocate to. And before I get to why, I'd like to emphasize that this Court need not and should not reach this issue under the Supreme Court's decision in INS Viventura. That is because this Court should not weigh the evidence in the first instance when the BIA has not properly done so. But putting that aside, I'd like to explain the three buckets of evidence that, when considered in totality, shows the likelihood of torture. The first and most important bucket of evidence shows that the Mexican police either acquiesce in or actively facilitated torture of people with gang-related tattoos. As Dr. Slack and Dr. Campbell explained in their testimony and in their written report, the Mexican police is plagued with corruption. They would work for certain cartels, and they get paid for doing so. One thing they would do is that they would identify suspicious people, including people with gang-related tattoos, and hand them over to the cartels that the police work for. And those cartels would then brutalize or even kill those people. And this can be found in the record on pages 879 and 893. But, Counsel, why is that not just the generalized country conditions that we've said is not enough to grant a petition? No, that is not generalized evidence. I can give you an example of what generalized evidence looks like, and that is the Vekri case, which is cited in the government's brief. And the citation for that is 558F3-1049. In that case, there were evidence that torture happens in Indonesia, I believe, including against detainees in military or police custody. But the petitioner did not present evidence that shows why he will likely end up in military or police custody. So there is a disconnect between the likelihood of torture showed by the generalized evidence and the petitioner's condition. But here we have evidence that shows, on the one hand, the police facilitates torture of people with gang-related tattoos. And then, on the other hand, it is undisputed that our client is covered with tattoos that is perceived to be related to the Sirenius gang in Mexico. Counsel, I have a different question, if I may. I'm puzzled, I think, by your reference to INS v. Ventura, because in this case, the BIA specifically held, and I'm quoting, the applicant has not established, independent of his own noncredible testimony, that it is more likely than not that he will be tortured by or at the instigation of or with the consent or acquiescence of a public official upon removal to Mexico, even considering the country conditions. That's the quotation from page 4 of the decision of the BIA. So the BIA looked at this issue on the merits. So why would we be precluded from looking at the issue on the merits? Well, that is because we not only need to look at the BIA's conclusion, we also need to look at whether the BIA gave reasoned consideration to the country conditions evidence. But that's somewhat of a lesser issue. They made a decision about the ultimate question. It's not like they said we need not decide X because we've decided Y, which is dispositive, and so we don't reach X. That's the sort of situation I think that Ventura was talking about. I don't understand how it applies here. Your Honor, I'd like to appoint the Court's attention to the Kobe Holder case, which is published at 659 F3rd 762. In that case, the BIA similarly considered the country conditions evidence. But this Court held that because there are indications that the BIA did not properly consider all of the evidence before it, this Court ended up remanding this case for the BIA to reconsider the evidence in the first instance. Right. I understand it's permissible, but I don't understand why it's required. That it is required because the BIA has the legally mandated role as the fact finder. And when it has not properly done so, this Court should not step in and weigh the evidence for the BIA. Instead, this Court should serve as a service role for judicial review and review this case only after the BIA has properly considered the evidence. Counsel, the BIA, as I understand it, made an alternate finding that even if there's a likelihood of torture, that he could relocate within Mexico to avoid future torture. As I see it, nothing that Mr. Slack or Dr. Slack or Dr. Campbell contradict that. Don't you agree? No, I don't agree with that. And first of all, I want to emphasize that the government has waived any argument on internal relocation in the CAT context because the government did not discuss this issue at all in its answering brief. But to answer Your Honor's question, there is evidence that shows why he could not safely relocate, and that is in Dr. Slack's testimony. Actually, at AR 396 and 97, he's asked specifically if there was anywhere in Mexico that your client could go to avoid the problem, and he said no. So there is evidence on that. Is there contrary evidence that shows that he could safely relocate if it's not waived? So Your Honor is asking if there is evidence showing that he could safely relocate. Yeah. Because there's evidence that he could not, so I'm asking if there's contrary evidence also. The contrary evidence would be the Petitioner state spent a few years in Quintana Roo in Mexico, and during the few years, the only incident that happened to him was that he was shot by cartel members. That's pretty good contrary evidence. Also, didn't on 870 of the record, Dr. Slack said that Quintana Roo has largely avoided much of the major conflicts? Referring to the cartel conflicts? Well, but the expert also testified that Quintana Roo is actually a key transition point for the transportation of cocaines that came from South Africa. So, but there's a conflict even within his own testimony, right? Yes, but I like to point this court to another piece of very important evidence in Dr. Slack's testimony. He testified that the Serenio scan, to which the Petitioner is a suspected member, has a close affiliation with a broader cartel called the Gulf cartel. And the Gulf cartel has been at war with other major cartels in Mexico, and that has cost hundreds of thousands of lives in the past decades. So everywhere the Petitioner goes in Mexico, he will very likely run into enemies of the Serenios or the Gulf cartels or the police who work for them. But isn't the fact that he lived in Quintana Roo for how many years? Do you know how many years he was there? I think it's about five or six years. And according to his own testimony, there was no targeted violence. The only violence was an accidental, right? It was accidental, but the chance of this accident be reoccurring is pretty high because Well, that's just speculative then. If he lived there for five years and nothing happened to him, why isn't that enough to support the BIA's relocation decision? Because the circumstances have changed. At the time he stayed at Quintana Roo, he was under the wing of his uncle. He was living with his uncle, and he was working at the ranch of his uncle, and that afforded him protection. But now his uncle has cut ties with him, so if he returns to Quintana Roo, he would no longer have any family supporting  We would have to overturn the credibility findings to find that, though, right? Well, if we are talking about what happened to the petitioner or what didn't happen to the petitioner in Quintana Roo, we would have to look at the adverse credibility determination. But even if we put that aside, the experts testify that because of his visible tattoos everywhere he goes in Mexico, that would attract violence to him. I'm sure you saw the motion to dismiss filed on Friday. Do you have any additional thoughts on that? Are you in contact with the petitioner? Yes, we were in contact with the petitioner, and we have filed a response to that motion yesterday. I saw that. But I guess it didn't say whether or not you were in contact with the petitioner, and why did he not respond to the order to surrender? Your Honor, I'd like to explain. So we recently learned of the fact that our client is in custody, and we managed to contact the public defender who is representing him in that criminal case, and we learned that we confirmed that he is in custody in San Francisco. And because the motion was just filed two court days before this hearing, we have not had a chance to speak with our client to learn the facts that happened over two years ago. That's reasonable. Okay. Do you have any other questions? Do you want to reserve some time for rebuttal? Yes, I'd like to reserve two minutes for the rest of my time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court, Andrew Nsinga on behalf of the Attorney General. To begin briefly on the Fugitive Disentitlement Act, Petitioner does not deny that the government waived that argument by acceding to the motion for a stay, and  removal, and by briefing this case. This is an event that happened two and a half years ago before the government agreed that he could stay in the United States up until the mandate issues and briefing on the merits. Well, with respect, Your Honor, the government never puts fugitive disentitlement, as far as I know, in briefs because it almost always occurs outside of the merits argument. That's not the point of my question, and perhaps my question wasn't clear. You had all the information necessary to make this motion more than two years ago when this individual did not show up for the appointment that he was supposed to show up for. And after that occurred, you didn't make the motion. Instead, you didn't oppose a stay of removal, and you — and more years passed, and you briefed it on the merits. Why isn't that a waiver of this argument? And if it isn't a waiver, why isn't it at least something we should take into account when exercising our discretion under this doctrine? Well, to first of all, Your Honor, Department of Homeless Security certainly was aware that he failed to show up. Of course, there is always difficulty, as Petitioner's opposition points out, that difficulty of liaising — liaison — easing with your client. And that, of course, applies just as equally to Petitioner, who did not — I don't understand how this is responsive to my question about why this isn't a waiver when the government knew that he didn't show up and then did all these affirmative things to bring this case to this panel on the merits. Well, again, a waiver is normally an argument about a discussion about being in a brief, that something has to be raised in a brief. So you think we couldn't hold that the government has waived this because it wasn't briefed? I don't even understand that. The Fugitive Disentitlement Act is an equitable consideration, Your Honor. Your Honor can, of course, consider that as a factor. But I'm unaware, and Petitioner has pointed to no rules suggesting a mandatory waiver or abandonment of an equitable concept. Ordinarily, though, a party that is invoking the court's equitable discretion is expected to act with due diligence, acting equitably themselves. I understand that the difficulty of filing such a motion late in the process. But the difficulty here is, yes, there are concepts of equity. But Petitioner himself has not been harmed in any way by the late filing of this motion. So this is a discretionary doctrine, right? Yes, Your Honor. Suppose we were convinced that 90 percent likelihood that Mr. Eugen Carnacion would, in fact, be tortured and probably killed upon return to Mexico. Could we take that into consideration in deciding how to exercise our discretion? I'm not aware of any case which suggests the court can't consider various things. Or cannot. Sorry? Can or cannot. I'm not aware of any decision that would suggest the court can't consider anything it wants. Cannot. Cannot. Correct, Your Honor. That it may consider various concerns in making this determination. But what Petitioner does not meaningfully dispute is that Petitioner filed a habeas petition to avoid redetention by Department of Homeland Security. The TRO filed the TRO granted by the district court prevented Department of Homeland Security from detaining him. Then, when the district court denied the motion preliminary injunction, that allowed DHS to issue the notice to appear for custody determination. He did not show up. Well, there's no dispute about that, I don't think. The question is, what, if anything, can we do about it or should we do about it, if we even can? I mean, if the Petitioner's lawyer had come up with some new theory last Friday, I'm pretty sure you'd be arguing that we couldn't consider it legitimately. No, Your Honor. It depends on what it would have been. Oh, so you would have been fine with them bringing up a whole new theory for their claim last week? With respect, Your Honor, they have brought up a new theory, which is a wholly independent argument that they've now presented for the first time. Well, that is not correct as I read the briefs. Okay. There's a whole section on looking at the evidence apart from his testimony in the opening brief. With respect, Your Honor, the government disagrees with that suggestion. But at the end of the day, if — Well, it's more than a suggestion, counsel. There's a whole section of the brief that has the title, Country Conditions Evidence Demonstrated that Mr. Uch will likely be tortured if returned to Mexico. Independently, country conditions can play a decisive role, et cetera. So they've made that argument in their opening brief. So would you have — if they hadn't, you would be arguing, as you are here, that they couldn't bring it up last week. And I'm asking why it isn't good for the goose as well as the gander. On a merits issue, yes, Your Honor, that would be correct, that those would need to be raised in a brief. But while this — take, for example, a jurisdictional matter or purely jurisdictional. It's not jurisdictional. Undeniably, Your Honor. That is a whole separate ballgame. It is a separate ballgame. But so is equitable considerations about whether this Court's order would have any meaning at this point, frankly, for either side. Because if this Court sends this case back — now, Petitioner suggests maybe they found their client, maybe. But how are we supposed to have a removal proceeding when Petitioner does not want to show up to legal proceedings? And what certain — Can you address that? If that's — if it is true that he's in custody this whole time and so, therefore, couldn't respond, does that alleviate your concerns? Is that — would that negate the motion to dismiss? No, Your Honor. Because — sorry. Go ahead. Why not? Well, as this Court explained terribly, and which is a somewhat different case, but there, the Petitioner had actually — excuse me, the criminal defendant had actually been caught. They were in FBI custody. There was no doubt that if this Court granted or denied the criminal appeal, that the government could bring that criminal defendant to court. But here, we know that — well, we don't know what can possibly happen. And that's fundamentally the problem. What Petitioner has explicitly demonstrated is he will use the judicial processes, as he did in the habeas, to prevent his detention. And then when he loses, he will not show up. Well, that's what I don't understand. If he's in custody, he can't show up. He was — Assuming that's all true. The difficulty is, Your Honor, again, that while I agree the government should have better systems in place to liaison with the Department of Homeland Security to find the millions of people we must manage, Petitioner's counsels have one client here. And what we know is — I mean, the DHS is not considered part of the — the whole of DHS is not considered part of the U.S.A. litigating party — team, right? No, Your Honor. So we can't charge their knowledge to you? No. I think, again, this was an equitable concept to suggest that when Judge Graber is concerned about you — Right. My office was unaware. I personally was unaware. The government can litigate with the information in front of it. To the best of my knowledge, and Petitioner does not dispute this, that Petitioner was arrested in San Francisco in September of 2024. Oh, that's recent. So nothing explains the lack of showing up from the past. Exactly. What is your response to the argument in the written response that there's been no demonstration that he received the notice that required him to appear because there's no return receipt or other evidence proving that the notice was effective? I think that argument only underscores the problem of what's going on in this proceeding, Your Honor. Petitioner had a lawyer before the — in the habeas proceeding. Undeniably, that lawyer was aware, and she was litigating on behalf of Petitioner in a district court on habeas to prevent detention. But what Petitioner is suggesting is how — why would we possibly suggest that Petitioner's lawyers have to maintain contact with their clients? Well, because that's really a crux of how legal proceedings work. If this court sends a criminal defendant's case out on bond back to, say, another trial and no one knows where they are, how are we supposed to have a criminal hearing, Your  We can't. How are we supposed to have a ruling? That's a long answer, but it actually — you don't dispute, as I understand it, that there is no direct proof that the Petitioner received actual notice that he was supposed to show up. I mean, lawyers mess up sometimes. Maybe the lawyer didn't tell him. Well, Your Honor, at this point, if all we're doing is speculating on behalf of Petitioner, then you're right. I don't have an answer to such speculation. But Petitioner has used the — Is actual notice even the standard that we apply to notice provided to aliens? No, Your Honor. The difficulty, again, is this is not a legal concept. This is an equitable concept. And the Court, of course, can consider that concern. But again, it only underscores that Petitioner then doesn't maintain contact with his lawyers, period. That's what we know. And just to clear it up, when did you learn that he didn't respond to that order? Thursday morning. That's you. But when did the government learn? Two and a half years ago, when he didn't show up. But isn't waiver only by the lawyers, not by — I've just never seen the whole of government being charged with waiver. I agree, Your Honor. I think the difficulty is this is, again, an equitable concept. It suggests this government was somehow inequitable when it can't detain one out of millions of people. And there are legitimate difficulties in tracking people, and particularly when Petitioner's counsel apparently lost track. I mean, we can listen to the verbs used. We were in contact with our client. Well, when did you cease to be in contact with your client? Petitioners come to this Court with four lawyers who can't identify clearly to this Court when any of this occurred. I agree, Your Honor, that it would always be better if the Department of Homeland Security and DOJ had better systems to track the millions of people we must track. But particularly where criminals tend to abscond, and in this case have reflected that they will not be bound by the judgments of the judiciary, this is where the Federal — this is where the Fugitive Disentitlement Doctrine comes into play. When is the last time this Court applied that doctrine in an immigration case? I could not find anything more recent than maybe 12 or 15 years ago. Are you aware of any more recent application in this context? I'm unaware. That does not mean that does not exist. The government fairly regularly does rely on these motions. In fact, I personally have filed one more recently in this Court, but I do not remember when it was, to be honest with you, Your Honor. It's hard to keep track of hundreds of cases. But if Petitioner wants to complain, well, it hasn't done recently, well, commonality — Complain. I'm asking a question about the exercise of our Court's discretion over time. Right. Well, obviously, from the Court's decision in Tarablian, it just did this last year in a criminal case. And again, that case, yeah, is a — That's a criminal. Well, that's where the doctrine originated, correct? It's where it originated. Yeah. But it continues to be — And that's where it's often applied. It's where it's often applied. That's why I was asking about immigration cases specifically. I understand, Your Honor. It certainly is applied. It stems, obviously, from, if I remember correctly, a 19th century Supreme Court decision. But courts have routinely applied this in the immigration context. And the rationale applies pretty straightforward for the exact same reasons, that if a litigant's not going to be bound by the consequences of decisions that they make and the lawsuits and the decisions of this Court, then it really undermines this Court's authority to issue meaningful orders. But there is, again, a flip side of that, which is, if this Court were to send this case back, as Petitioner is asking, how is the government supposed to do a removal proceeding when Petitioner doesn't show up? These are really basic — Would this be the first time there's been a removal proceeding where someone is in custody under another sovereign? No, Your Honor. But we don't know. There's a way to do that, right? There is now a way to do it if he is detained. And that's the difficulty, is when Petitioners come to court saying, we finally found our client, I can't respond to that. I also don't understand why there would be another hearing. I think what counsel has argued is that this has to go back to the BIA for a reanalysis of the existing record. So I'm not really sure why it matters whether this person is in custody in a California jail or not. Well, Your Honor, because sometimes that would require a remand to the immigration judge, depending on what Petitioner is actually arguing. Could I ask you to comment, apropos of this question, about the extraordinary level of heat and friction in the hearing here? I think the immigration judge said it was the worst that judge, the most extreme example that judge had ever encountered. Yes, Your Honor, undeniably there was tension between Petitioner's prior counsel and the immigration judge. As illustrated in the brief, Petitioner's counsel tended to get objections overruled, raise the objection again, the immigration judge would overrule her. And I think at least what we can understand as litigators, for example, in AR-488, when the I.J. repeatedly overrules this attorney and then she says, well, I don't care, I'm going to argue anyways, there at some point becomes very difficult for any judge, whether an Article III judge or... And one of the things, frankly, that concerns me is that that tension and the confusion generated for the Petitioner in this case is somebody who is not even comfortable in Spanish. That's not his native language. He made the decision to testify in Spanish, Your Honor. Sure, but do you have Mayan translators? Yes. Your Honor, the immigration judge has access to a translation system that can do languages with others that I've never heard of. So yes, they could have done it in any language he wanted. So this post hoc assertion that I don't speak Spanish, that's not on the government, Your Honor. He's not saying he doesn't speak Spanish, but I'm trying to picture the experience of somebody in his role in this proceeding as his lawyer and the judge are arguing in English, and he probably has no clue what's going on. It would be extremely disconcerting. Well, if he has no clue what's going on, Your Honor, then how can this argument about bullying and any be relevant? He doesn't understand what's going on at all. Well, that's the initial answer. But, yes, the reality is this is just post hoc assertions of appellate counsel that simply don't appreciate the complexity of the factual record. You're two minutes over if you want to wrap up. Yes, Your Honor. Although we focus largely on the Fugitive Disentitlement Act, the reality is that petitioners act. Excuse me. I don't find that one. No, I agree, Your Honor. The government wouldn't mind an act based on it, but it is simply a doctrine at this point. Even disregarding the Fugitive Disentitlement Doctrine, Your Honors, the record doesn't compel reversal of the adverse credibility determination. And what petitioner's argument to this court today, and there's really no need to go into it, is no matter how petitioner argues it, they run into the adverse credibility determination. The experts relied on his testimony and evidence. He's relied on it. Everywhere petitioner turns and tries to swerve and change the argument, they run into the adverse credibility determination. That raises an interesting question, that the experts did rely on his testimony to give their testimony. If the BIA found him or the IJ found his testimony unreliable, what do we do with experts' testimony? Because there's nothing independent of his testimony and statement. Is there a case that says that where you would strike those parts? Well, I'm not aware of a specific case on that. But, I mean, it would seemingly be baked into the concept of independence. The fruit of a poisonous tree, essentially? Well, not even like some sort of, like, again, equitable concept, but just simply the concept of how can their testimony on, say, gang involvement, the U.S. family. Well, to some extent, their testimony was not based on his testimony. For example, they relied on his visual appearance, which was what it was, and his Mayan ancestry and his name and things not related to his testimony. They relied on everything. See, Petitioner, I think the interesting phrase Petitioner wants to say is bucket. But the problem is this is not about buckets of identities. This is the experts used a bucket of identity issues to talk about gang issues, tattoos. But that's what I'm saying. The identity is apart from his testimony. I don't think that there's any quarrel on the part of the government that he's of Mayan ancestry and his name demonstrates it, and that he has facial tattoos and these other facts that are unrelated to what he said. Well, first of all, I mean, I apologize. We are far over. Go ahead and finish. Okay. First of all, the facial tattoos is part of the average credibility determination. In fact, Petitioner doesn't seem to have a consistent explanation to this court. He has the tattoos, though. And what the expert said is a person with those tattoos will be killed if people notice those tattoos. It doesn't matter why he has them, does it? Your Honor, I'm not aware of it. Someone suggesting that someone with a gang tattoo is automatically killed. It reflects the difficulty when someone comes to court.  But what I'm saying is the fact of his visual appearance is a fact apart from his testimony, is it not? It is. But the meaning of it, because Petitioner, in fact, in the reply brief suggests, well, these aren't gang tattoos because they weren't put on me by my uncles. That's noticeably wrong because in AR 823, paragraph 49, he specifically said the gang did put these tattoos on me. Well, did the expert independently look at the facial tattoos and opine that they're gang tattoos? He said they were likely gang tattoos. I believe Professor Slack said they were gang tattoos. We would take that.  The difficulty, though, is there's no what will happen. Torture must happen on account of, or not on account of, based on all of them. You're well over your time. Thank you very much, counsel. Thank you.  Your Honors, I'd like to make three points. The first point is that the government argued there is no country conditions evidence independent of the Petitioner's testimony. We disagree with that. The expert gave their testimony on the gang violence and the police corruption in Mexico based on their years of academic studies, and that is independent of the Petitioner's testimony. And also the Petitioner's visual appearance, his gang-related tattoos, are also independent of his testimony. And his Mayan identity and his Mayan accent, which will make him stand out in Mexico, is also independent of his testimony. And those evidence should be given recent consideration, regardless of whether he is found to be credible. Counsel, if we were to agree with that, wouldn't that mean that any time any Petitioner has a gang tattoo on their face that they'd be entitled to relief against removal? No, that is not the case. This should still be analyzed on a case-by-case basis. For example, if a Petitioner with gang-related tattoos has a powerful family in Mexico who could afford them protection, then that would make it less likely that this person will be tortured in Mexico. But here our client has no family support in Mexico. Again, that's dealing with the credibility determination, right? We're not looking at that. Yes, we're not looking at that. And also, it also depends on whether the tattoos could be easily removed so that they could safely go back to Mexico. But here the Petitioner testified that he could not afford the expensive procedure of removing the tattoos. And also there are contra-conditions evidence, independent of his credibility, that shows tattoo removal requires repeated sessions and can be extremely painful, and they may not be completely removed depending on the size and the shape of the tattoos. And here it is undisputed that the Petitioner is covered all over his body with those tattoos, and that would make removal extremely difficult. I presume that someone with a different ethnic background might be treated differently, someone who is not Mayan by origin. Is there evidence in the country conditions report that's specific to Mayan ancestry? All from Dr. Slack and Dr. Campbell. Those are from Dr. Slack and Dr. Campbell. I believe the evidence speaks to the difficult situations for indigenous people in general, but I don't think the evidence is specific to Mayan ethnics. And if I could just — I'd like to hear your other two points, if I could. Thank you, Your Honor. My second point is that the government argues that our client didn't show up and would not show up in the future, but the government has not met its burden to prove that our client received the actual notice. The government pointed to the fact that our client was represented by counsel in his detention case. But in the joint status report, which was co-signed by the petitioner's counsel, that report only says counsel received notice. It didn't say the petitioner actually received notice. And it is onerous on the government to prove that our client received the actual notice. And I'd like to move to my third point, which is to Your Honor's point that this fugitive disentitlement doctrine is rarely applied in the immigration context. And the only case the government cited in their brief applied this doctrine under the extreme circumstances where the petitioner had simply disappeared and no one, including their counsel, was in contact with the petitioner. But here that's not the case. We have been in contact with our client periodically throughout this case. And admittedly, it takes— Why didn't he show up to that hearing? I still haven't heard a reason for that. Your Honor, as we explained, we have not had a chance to discuss this with our client. And it is the government's burden to show that our client was actively evading justice. Well, why is that? Can't you do a presumption that if his lawyer got the notice, and presumably he was in contact with his lawyer then? Your Honor, this is pure speculation whether he was or was not in contact with his lawyer, as the government cannot meet their burden based on pure speculation. Would this be an appropriate topic for a fresh hearing? The fugitive disentitlement issue? It could be, depending on whether this Court will allow it. And our position is that equitable considerations here weigh against having an independent hearing on this issue. Why? Because to invoke this equitable doctrine, the government has to exercise its own due diligence. And the government has not done so. And it only brought up this old incident just a few days before this hearing. The counsel represented that he just found out about this on Thursday. He filed it on Friday. Why is that not diligent enough? Well, counsel could have found out about it much earlier. And the status report is publicly available, and the government could have found out about that public filing two years ago. Do you think we should charge the party here with all of the government's knowledge? Sorry, Your Honor, I didn't get this question. The litigating attorneys here should be charged with the knowledge of the whole government. Well, that would be, admittedly, that would be too burdensome to our colleague on the other side. But there should be some reasonableness, right? Yes, there should be some reasonableness. And a simple phone call two years ago when the case started would be reasonable. For those reasons, we ask that this case be remanded at least for the reconsideration of the country conditions evidence for the cash relief. Thank you. Thank you, counsel. And thank you very much for handling this case pro bono, well argued on both sides. Thank you.
judges: GRABER, Hamilton, BUMATAY